IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | | |
|---|---|---|
| STATIONS WEST, LLC, an Oregon limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | Civil Case No. 06-1419-KI |
| vs. | ) ) | OPINION AND ORDER |
| PINNACLE BANK OF OREGON, an Oregon corporation, BP WEST COAST PRODUCTS, a Delaware limited liability company, and JOEL PARKER, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

Terrance J. Slominski
Slominski & Associates
Commerce Plaza
7150 S.W. Hampton Street, Suite 201
Tigard, Oregon  97223

    Attorney for Plaintiff

Page 1 - OPINION AND ORDER

Mark M. LeCoq
Joel A. Parker
Schwabe, Williamson & Wyatt, P.C.
1600-1900 Pacwest Center
1211 S.W. Fifth Avenue
Portland, Oregon  97204

      Attorneys for Defendant Pinnacle Bank of Oregon

Douglas C. Berry
Mark Owen Gabrielson
Graham & Dunn P.C.
Pier 70 ~ Suite 300
2801 Alaskan Way
Seattle, Washington  98121

      Attorney for Defendant BP West Coast Products LLC

Jonathan Mark Radmacher
J. Kurt Kraemer
Barry L. Groce
McEwen Gisvold LLP
1100 S.W. Sixth Avenue, Suite 1600
Portland, Oregon  97204

      Attorneys for Defendant Joel Parker

KING, Judge:

      Plaintiff Stations West LLC brings a claim for wrongful foreclosure, breach of contract and violation of the Petroleum Marketing Practices Act ("PMPA"), and claims for conversion and trespass against BP West Coast Products LLC ("BP").  Before the court are BP's Motion for Summary Judgment Dismissing Plaintiff's Complaint (#78) and BP's Motion for Summary Judgment on Counterclaims Against Stations West (#90).  For the following reasons, I grant the motions.

Page 2 - OPINION AND ORDER

## BACKGROUND

Shaikh Husain formed Stations West to build and operate a gas station and convenience store in Dundee, Oregon. Stations West entered into two franchise agreements with BP on April 15, 2003. The first agreement was the Contract Dealer Gasoline Agreement, and the second was the am/pm Mini Market Agreement. Both agreements had 15-year terms.

Stations West received a $2,100,000 loan from Pinnacle Bank of Oregon ("Pinnacle") in July of 2003, which was conditioned on Stations West obtaining a commitment from another lender to refinance the gas station after construction was completed. Stations West received a preliminary commitment from Matrix Bank for a $1,900,000 loan on August 8, 2003. In October of 2003, BP agreed to loan Stations West a total of $400,000 for improvements, pursuant to two loans. The first loan was for $300,000 for improvements to the gasoline facility, and the second loan of $100,000 was for improvements to the am/pm store. The loans were secured by deeds of trust on the station, subordinate to the Pinnacle loan. Section 5.5 of the loan agreements provides that the outstanding principal amount is due and payable upon an "event of default," which is defined to include termination of the gasoline or am/pm franchises. Decl. of Martin Cuneo, Exs. 3, 4.

Construction was completed in June of 2004–late and at least $400,000 over-budget.

Husain contends that when he went to a BP sales meeting, he met Gary Heitlauf who explained the ARCO am/pm marketing plan. He says Heitlauf told him that generally stations would sell gas at four to six cents less than the competition, and BP would sell gas to the dealers at a price that would allow the dealer to resell the gas at a price of four to six cents less than the

competition's price. The dealer could ask for a temporary voluntary allowance in the event that the competition lowered prices unexpectedly.

Husain contends that Stations West was only able to sell gas for four cents lower than the competition because BP sold the gas at a price set at twelve cents below the competition's retail price, instead of between sixteen and twenty-three cents less. Husain also asserts that Tim Curtis, a BP representative, told Husain to lower the price because Stations West was not selling enough gasoline, but Stations West was only breaking even.

Stations West claims it was overcharged by approximately four to five cents per gallon, for a total damage of $458,826.

Stations West asserts that there are at least eight ARCO stations in the trade zone, and that BP allowed other ARCO stations to sell gas cheaper than Stations West by giving them discounts. BP denies these facts, stating that before May 2005, no other dealers were within plaintiff's zone, and after that date two other ARCO dealers were within the zone. Husain admitted in his deposition that the closest ARCO station was 12 miles from Stations West. BP also argues that plaintiff offers no evidence to support its statement that BP allowed other ARCO stations to sell gas cheaper than Stations West could.

Husain claims he sought temporary allowances to sell gasoline at a lower price. Tim Curtis told Husain to talk with Martin Cuneo, and Cuneo told him to talk to Curtis. He says Stations West received only 30 allowances out of 805 loads of gas.

Initially, Stations West paid for gasoline from BP by electronic funds transfers through its Pinnacle bank account.

Page 4 - OPINION AND ORDER

Stations West began defaulting on payments for gasoline.  BP contends Pinnacle either rejected payments for insufficient funds or reversed payment for eight separate loads of gasoline, beginning in November 2005.

| Delivery Date | Amount |
|---|---|
| 11/22/05 | $24,277.49 |
| 11/22/05 | $24,505.27 |
| 11/23/05 | $24,384.82 |
| 11/24/05 | $24,384.82 |
| 11/29/05 | $24,169.52 |
| 1/30/06 | $22,647.64 |
| 2/5/06 | $22,450.76 |
| 2/6/06 | $22,722.43 |
| **Total** | **$189,542.75** |

Stations West denies this fact.  Stations West also asserts BP charged it twice for the same invoice on January 10, 2005 ($17,733.76),[1] June 29, 2005 ($22,817.19), and September 16, 2005 ($29,734.15).

BP continued to deliver gasoline, but suspended Stations West's ability to pay with electronic funds transfers.  Instead, Stations West was required to pay C.O.D., or collection on delivery.  Stations West was required to pay for deliveries of gasoline with a cashier's check in a predetermined amount.  The cashier's check was applied to the cost for the gasoline, and any

---

[1]In its CSMF, plaintiff states the amount as $17,896.62, but that amount is not reflected twice on Exhibit 1.  Rather, $17,733.76 is reflected twice.

remaining amount was applied to the existing trade debt.  BP alleges Stations West still owes $106,322.63 on its original trade debt of $189,542.75.

Stations West asserts that from June through September 2006, BP failed to apply $50,000 to the trade debt.  BP denies this assertion.

Plaintiff claims it deposited $13,800 to secure unpaid invoices, and BP refused to allow it to apply that amount toward unpaid gas.  BP admits that it received $13,800, but introduces evidence that it applied the deposit to plaintiff's trade debt.

Stations West was unable to pay its promissory note to Pinnacle, and Pinnacle extended the date several times.  The final extension was to January 5, 2006.  Matrix Bank did not approve permanent financing for Stations West.  Pinnacle sent a notice of delinquency to Stations West on January 17, 2006, and Pinnacle's attorney, Joel Parker, sent a demand letter on March 3, 2006.  Pinnacle filed a "Notice of Default and Election to Sell" in May 2006, to foreclose the deed of trust by advertisement and sale pursuant to ORS 86.705 through 86.795.

BP sent Stations West notice of termination of the gasoline franchise and the am/pm franchise on September 12, 2006.  Section 17.1(e) of the gasoline franchise authorizes termination upon "[t]he loss of Buyer's right to possess the Premises," and section 17.1(h) authorizes termination based on "Buyer's failure to timely pay [BP] all sums to which [BP] is legally entitled."  Cuneo Decl., Ex. 1.  Termination of the gasoline franchise resulted in termination of the am/pm franchise, pursuant to the cross-default provisions in the am/pm franchise and the loan agreements.  The notices warned Stations West that the termination would be effective 90 days from the notice date or upon the foreclosure sale.

Stations West stopped buying and selling gasoline and ceased operations.

Page 6 - OPINION AND ORDER

BP's second notice, issued October 26, 2006, terminated the franchises immediately, based on sections 17.1(i) and 17.1(o) permitting termination upon the buyer's failure to operate the station and failure to order and sell gasoline. Both loan agreements were terminated at the same time, as a result of the terminations of the franchises. Stations West owes $346,667.00 on the loan agreements, and an additional $17,333.35 for late fees for failing to pay the amount due within five business days of the due date. The $17,333.35 represents "[f]ive percent (5%) of the overdue payment," as provided in section 8 of both Secured Promissory Notes. Cuneo Decl., Exs. 3, 4.

The foreclosure sale was initially scheduled for October 3, 2006. Stations West filed this action in Yamhill County Circuit Court on September 29, 2006. A temporary restraining order was entered by the Circuit Court, conditioned on Stations West posting a $25,000 bond by October 2, 2006. It did not post the bond. On October 2, 2006, Pinnacle assigned its interest in the deed of trust to BP, which held a security interest junior to Pinnacle's. BP removed the action to this Court on October 5, 2006.

Plaintiff claims BP changed the locks on the building, locking Husain out, on October 10, 2006. Husain left equipment costing him $400,000, and worth $100,000, including shelving for which plaintiff paid $42,000.

The foreclosure occurred on October 26, 2006. BP purchased the station for $2,413,786.13, the amount Stations West was indebted to Pinnacle.

BP asserts that it took possession of the station on November 6, 2006. BP also asserts it found very little personal property on the site, other than a few shelves.

Page 7 - OPINION AND ORDER

Plaintiff brought suit against Pinnacle, BP, and Joel Parker, the trustee under the deed of trust between Pinnacle and the individual who initiated the foreclosure action against the station. I previously dismissed the trustee and stayed the case against Pinnacle pending arbitration. When BP filed a Motion to Stay pending Pinnacle's arbitration with plaintiff, plaintiff voluntarily dismissed Pinnacle. Accordingly, the only remaining defendant is BP.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. Universal Health Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

## DISCUSSION

I.    BP's Motion for Summary Judgment Dismissing Plaintiff's Complaint

Plaintiff alleges BP wrongfully foreclosed the deed of trust on the station, breached its contract with plaintiff, violated the Petroleum Marketing Practices Act (PMPA), and trespassed on and converted its property.

A.    Wrongful Foreclosure

Plaintiff alleges the trustee's notice of foreclosure was defective. Plaintiff alleges the notice of foreclosure did not state the specific default for which the foreclosure was made, failed

to state the sum owing on the obligation secured by the trust deed, and failed to set forth the mailing address of the trustee. I previously dismissed this claim against the trustee.

BP points out that the notice states the name of the trustee and his address. May Aff., Ex. N. The notice describes the trust deed and states that plaintiff failed to pay the principal and accrued interest. Finally, the notice states "the sum owing on the obligation" is the "[p]rincipal balance of $2,099,280.77 together with interest (at the default rate), plus late charges, trustee's fees, attorneys' fees, costs of foreclosure, and any sums advanced by the beneficiary pursuant to the terms of the Trust Deed." Id. On this last point, BP refers back to the statute, which requires only a statement regarding the "sum owing on the obligation secured by the trust deed." ORS 86.745. If a party needs more information, the party may request further detail from the trustee such as "[a] statement of the exact amount required, as of a specified date, to cure the default or satisfy the obligation, including the costs of foreclosure, trustee fees, attorney fees and per diem interest." ORS 86.759.

BP also argues that even if the notice was defective, plaintiff's remedy is under ORS 86.742. That statute entitles a party to damages if it did not receive notice of a foreclosure. The party must allege and prove: it "could and would have cured the default" had it been given notice; it did not receive actual notice of the sale "at least 25 days before the date the trustee conducted the sale;" and it "sustained actual damages as a result of such person's loss of the opportunity to cure the default" because of the lack of notice. ORS 86.742.

Plaintiff recognizes that the court has ruled on the above issue, but it seeks to preserve its argument that the foreclosure process was flawed. It reiterates that the notice was defective, without responding to BP's argument and evidence that the notice was not defective. It also

Page 9 - OPINION AND ORDER

argues there is nothing in the statute that would limit the injured party to the remedies in ORS 86.742.

The notice appears to comply with the statute, and plaintiff has not described how the notice was defective. In addition, plaintiff has not shown that it requested the information from the trustee, has not alleged or proved that it did not have actual notice of the sale, and has not alleged or shown that it could have and would have cured the default. This wrongful foreclosure claim against BP is dismissed.

B.    Breach of Contract and Violation of the PMPA

Plaintiff alleges that BP breached the gasoline franchise by "overcharging plaintiff for gasoline products" and violated the PMPA.

BP first points out that the PMPA regulates only the termination or nonrenewal of a petroleum franchise. In any event, BP argues it did not "overcharge" plaintiff for gasoline.

Plaintiff does not respond to the argument that PMPA does not give rise to a claim for breach of contract, and does not argue that the termination was in violation of the PMPA. As a result, this claim against BP is dismissed.

With regard to the "overcharging" issue, BP first contends that it repeatedly asked for evidence that it "overcharged" plaintiff. Plaintiff has not identified in discovery any evidence it was overcharged. The only time BP demanded more money than gas it actually delivered was when plaintiff was placed on C.O.D. status, and the extra money was applied to plaintiff's debt to BP. Husain testified in his deposition that plaintiff's former manager, Debi Ferrante, could best explain how plaintiff was overcharged. BP submits her declaration in which she states, "There was never a time when Mr. Husain complained to me about any overcharges for gasoline by BP.

Page 10 - OPINION AND ORDER

In addition, I am aware of no instance in which BP overcharged Stations West for gasoline."
Ferrante Decl., ¶ 7.  BP also submits a declaration attesting to the fact that it never charged
plaintiff more for gasoline than it charged other dealers in the area.

Plaintiff asserts only that there are issues of material fact.  Its entire argument is as
follows:

> There is amble [sic] evidence to support Plaintiff's claims.  BP
> overcharged Plaintiff for gasoline so that it could not maintain its relationship
> with its Bank or refinance the property as planned.  Then, after causing Plaintiff to
> be in default under the Mortgage, it used the foreclosure as an excuse to terminate
> its franchise.  Every contract has a covenant of good faith and fair dealing.  BP
> breaches its contract with Plaintiff causing it to go into foreclosure and lose its
> property. . . .
>
> A franchiser owes its franchisees a special duty especially where the
> franchisee cannot go to any other source for its supplies.  Having total control
> over the franchisee, BP has a duty to sell gasoline at a price that its franchisees
> can make a return of their investment.

Pl.'s Resp. at 3.

I note BP's concern that plaintiff failed to provide information related to its allegations of
overcharging, but I will nevertheless consider plaintiff's argument on the merits.

Plaintiff has failed to raise genuine issues of material fact precluding summary judgment
on its breach of contract claim.  Stations West contends BP owed some duty to ensure Stations
West made a profit, and that it owed Stations West a duty of good faith and fair dealing.  A
typical franchise relationship, however, does not impose a duty on a franchisor to act for the
benefit of the franchisee, and plaintiff has not pointed to any exceptional degree of reliance
meriting application of any special duty here.  See Norwood v. Atlantic Richfield Co., 814 F.
Supp. 1459, 1468 (D. Or. 1991) (explaining factors to determine whether "franchisor has a duty
independent of the contract to act for the franchisee's benefit).  Similarly, the duty of good faith

Page 11 - OPINION AND ORDER

and fair dealing operates to further each parties' reasonable expectations, and does not require BP

to price its gasoline in a way to assure plaintiff's success.  See U.S. Genes v. Vial, 143 Or. App.

552, 559, 923 P.2d 1322 (1996) ("reasonable expectations include the right of either party to

further its own legitimate business interests").  Stations West does not explain how any

comments Heitlauf made about pricing or the availability of temporary voluntary allowances,

subsequent to Stations West's entering the franchise agreements, inform these duties.

Moreover, Stations West offers no evidence that BP charged it more for gasoline than it

charged any other dealer, that the price was not consistent with prices in the industry, that the

price was discriminatory, or that BP intended to cause plaintiff harm.  BP explains that it charges

the same price to all retail dealers who buy gas at the same time and in the same geographical

area, or "price zone" set by BP.  The price zones are established after considering multiple

factors such as competition in the area, location, natural barriers, and traffic patterns.  A detailed

sales chart identifies two other facilities in Stations West's price zone, and plaintiff fails to point

to a single occasion where BP charged Stations West more than it charged the other stores.[2]

Husain contends now that there are at least eight ARCO stations in Stations West's area,

and that when he would drive by other stations, he noticed that they were selling gas at only a

few cents more than Stations West was paying for gas.  Husain testified, however, that there were

only three gas stations along the highway for 50 miles west from Dundee to Lincoln City, and

two others off the highway, 12 and 27 miles away.  Only one of these five stations was an ARCO

station.  Furthermore, Husain does not explain why the court should consider any of the other

---

[2]I also note BP's argument that Stations West was required by section 8 of its Contract
Dealer Gasoline Agreement to "notify [BP] in writing" of any "nonconformity of the type,
quantity or price" of any product delivered within 30 days of the delivery.  Cuneo Decl., Ex. 1.
Failure to so notify BP results in a waiver of any claims based on the nonconformity.  Id.

Page 12 - OPINION AND ORDER

ARCO stations with which he claims Stations West competed, or why BP's price zone should include those other stations.

Husain also asserts that BP charged him twice for the same invoice:  January 10, 2005, June 29, 2005, and September 16, 2005.  Normally, the invoices were paid through Pinnacle, plaintiff's bank, via electronic funds transfers.  When Husain identified the problem, he contacted the bank, which told Husain to call BP.  According to Husain, when he contacted BP, the representative said it was investigating the problem.

Plaintiff relies on bank statements showing that BP requested payment twice on January 10, 2005, June 29, 2005, and September 16, 2005.  The evidence does not raise an issue of fact that Pinnacle transferred money to BP multiple times for the same gasoline delivery.  Plaintiff has not produced evidence that the withdrawals are for any gasoline delivery, let alone for the same one.  Furthermore, the evidence plaintiff does submit shows only that an electronic transfer was requested twice for the same amount, not that it was paid twice.  The bank statements reflect the account held insufficient funds to pay the demands.

Finally, Husain asserts that BP took more than $50,000 than was accounted for, during the period when BP delivered gas to plaintiff by C.O.D.  Husain also contends there are discrepancies in BP's documents, and relies on plaintiff's Exhibit 4 to identify some of the discrepancies.   BP offers the Declaration of Elizabeth Chang, a financial analyst in BP's credit department.  That exhibit accounts for every payment made on C.O.D., and credits plaintiff with any amount over the charge for each delivery.  Moreover, plaintiff's exhibit 4 neglects to account for the premium unleaded gasoline delivered at the same time as the unleaded gasoline and billed

in the same invoice.  Plaintiff does not submit invoices or receipts challenging Chang's

statements.

Plaintiff's breach of contract claim is dismissed.

C.    Trespass and Conversion

Plaintiff alleges in support of its trespass claim that "on or about November, 2006" BP

"entered and broke into Plaintiff's property and changed the locks."  First Amended Complaint, ¶

49.  In response to BP's motion for summary judgment, plaintiff asserts a different theory,

contending that "BP jumped the gun and took possession of the property before the foreclosure

had taken place.  BP locked Plaintiff out and took all of its equipment."  Pl.'s Resp. at 3.  In his

declaration, Husain states that when he went to the station on October 4 or 5, some workers said

they were hired by ARCO to make improvements.  When he went to the station on or around

October 10, the locks had been changed.  He entered the station through the roof and removed his

personal papers.

In Oregon, a trust deed securing the sale of property is considered to be a mortgage.  ORS

86.715.  Since Oregon is a "lien theory" state, a mortgagee is not entitled to immediate

possession upon default.  Instead,  "[u]ntil foreclosure, the mortgagee lawfully may take

possession only if the mortgagor voluntarily relinquishes possession."  Kerr v. Miller, 159 Or.

App. 613, 621, 977 P.2d 438 (1999).

There is no dispute Pinnacle assigned its interest in the deed of trust to BP on October 2,

2006, that the foreclosure occurred on October 26, 2006, and BP entered the property on

November 6, 2006.  Plaintiff alleges in its complaint that BP changed the locks in November of

2006.  Since I have ruled for BP on plaintiff's wrongful foreclosure claim, I conclude plaintiff

Page 14 - OPINION AND ORDER

fails to raise a genuine issue of fact that BP did not have authority to enter the property in November 2006.

Plaintiff now seeks to avoid summary judgment by asserting a basis of liability not alleged in its initial complaint or in its First Amended Complaint. Husain asserts for the first time that BP changed the locks on or before October 10, before the foreclosure sale had concluded. BP specifically denies entering the property before November 6, 2006.

I will treat these new allegations as plaintiff's motion to amend its First Amended Complaint. The discovery deadline was January 15, 2008. I note that "[a] party is not entitled to wait until the discovery cutoff date has passed and a motion for summary judgment has been filed on the basis of claims asserted in the original complaint before introducing entirely different legal theories in an amended complaint." Priddy v. Edelman, 883 F.2d 438, 446 (6th Cir. 1989), citing Acri v. International Ass'n of Machinists & Aerospace Workers, 781 F.2d 1393, 1398-99 (9th Cir. 1986) ("late amendments to assert new theories are not reviewed favorably when the facts and the theory have been known to the party seeking amendment since the inception of the cause of action"). The reasoning applies here; plaintiff has not explained its delay in asserting its new theory, and BP would suffer undue prejudice should the court consider the evidence in evaluating BP's motion for summary judgment. I will not allow plaintiff to amend its complaint to support this new theory.

With respect to plaintiff's conversion claim, Husain says he left equipment that cost $400,000 in the building, as well as inventory. He says the value of the equipment and inventory at the time he was locked out was about $100,000. He says, "I could not take the equipment and the inventory because I did not have the keys to the building and it would have taken a crew of

people. I did not abandon the station. I was locked out." Husain Decl., ¶ 21. He offers evidence

showing the shelving for which he says he paid $42,000 was given away for free on Craig's List.

Other than the shelving, plaintiff does not identify the equipment that he says was taken,

or the fair market value for the equipment, in opposing the motion for summary judgment. As a

result, he fails to raise a material issue of fact that BP " intentional[ly] exercise[d] . . . control"

over the Stations West property "that interfere[d] with" plaintiff's rights "seriously enough to

justify requiring" BP to pay him damages. See Beall Transport Equip. Co. v. Southern Pacific

Transp., 186 Or. App. 696, 701, 703, 64 P.3d 1193, clarified on recons., 187 Or. App. 472, 68

P.3d 259 (2003).

BP submits a list that plaintiff provided two weeks after the discovery cutoff date in

which plaintiff did identify the equipment, valuing it at $19,700. BP objects to any reliance

plaintiff may place on this list in attempting to survive summary judgment. I do not consider the

evidence because plaintiff has not made an attempt to show that its failure to disclose the

information in a timely manner was "substantially justified or is harmless." Fed. R. Civ. P. 37(c)

(party not allowed to use information not disclosed in discovery unless "substantially justified' or

"harmless"). Additionally, I note the shelving for which Husain says he paid $42,000 was not

among the items listed. BP is entitled to summary judgment on plaintiff's conversion claim.

In sum, plaintiff's trespass and conversion claims are dismissed.

II.    BP's Motion for SJ on Counterclaims against Stations West

BP filed counterclaims against Stations West in its Answer to plaintiff's First Amended

Complaint. It now seeks summary judgment on those counterclaims. Relying on the declaration

of Elizabeth Chang, its financial analyst, BP seeks a total of $470,322.98. That amount is based

Page 16 - OPINION AND ORDER

on: $106,322.63, the amount plaintiff failed to pay for eight gasoline deliveries, $346,667,

representing the principal balance remaining on the $400,000 loan BP gave plaintiff, and

$17,333.35 for late fees on the loans.  BP also seeks reasonable attorneys' fees, as permitted by

the Loan Agreements, to be determined by a future motion.[3]

Plaintiff moves to strike BP's Motion for Summary Judgment on the Counterclaims

because plaintiff contends the Answer to the Amended Complaint did not have counterclaims.

Plaintiff thought BP had abandoned its counterclaims.

BP points out that its counterclaim is part of its Answer to the First Amended Complaint

It also points out that plaintiff is in default for failing to answer the counterclaim.  Fed. R. Civ. P.

12(a)(1)(B) (answer counterclaim within 20 days of service).

Plaintiff failed to file an answer to BP's counterclaims.  Plaintiff's counsel requested the

opportunity to file additional written argument.  In its supplemental brief, relying on Stations

West's bank statements, plaintiff argues BP was paid and is owed no trade debt.  It contends BP

offers no evidence Stations West's bank account contained insufficient funds to pay the

electronic funds transfers.  It also contends Chang's declaration is hearsay.

Plaintiff's argument is unavailing.  Pinnacle's president submitted a declaration in which

he explained that Stations West's bank account was overdrawn in December of 2005.  Amounts

were "provisionally posted to Stations West's overdrawn checking account" to pay BP, but

"[s]ince there was no money to pay [BP], Pinnacle Bank returned the [Automated Clearing

House] transactions."  May Decl., ¶ 12.  He supports these statements with a copy of Stations

---

[3]"If any lawsuit, reference or arbitration is commenced which arises out of or relates to
this Agreement, the Note, the other Loan Documents or the Loan, the prevailing party shall be
entitled to recover from the other party such sums as the court . . . may adjudge to be reasonable
attorneys' fees in such action . . . . "  Cuneo Decl., Exs. 3 and 4.

West's checking account statement.  Similarly, Chang's declaration contains the amount due on each invoice, including the invoice date and number.

As for the loan obligation, plaintiff's counsel did not dispute the amount due during oral argument, but now argues Chang has no personal knowledge to attest to the remaining amount of the obligation.  Chang is BP's financial analyst in its credit department, and has worked in that capacity for over seven years.  She has personal knowledge to attest to the amounts that remain due and owing on the loans.

Accordingly, I grant BP's motion for summary judgment and enter judgment against plaintiff in the amount of $470,322.98.  BP may submit a motion for attorneys' fees.

## CONCLUSION

For the foregoing reasons, defendant's Motion for Summary Judgment (#78) and defendant's Motion for Summary Judgment on its Counterclaim (#90) are granted.  A judgment will be entered for BP in the amount of $470,322.98.  Plaintiff's claims against BP are dismissed with prejudice.

IT IS SO ORDERED.

Dated this _____30th_____ day of April, 2008.


    _/s/ Garr M. King_____
    Garr M. King
    United States District Judge